## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**In re**: Brian K. Failon,                              Case No. 11-33877-KLP
     Debtor                              Chapter 7

Compass Chemical International, LLC,
     *Plaintiff*

v.                                                       Adv. Pro. No. 11-03229-KLP

Brian K. Failon,
     *Defendant*

## MEMORANDUM OPINION

This matter is before the Court on the motion by Plaintiff Compass

Chemical International, LLC, ("Compass") for summary judgment (the

"Summary Judgment Motion") against Debtor Brian K. Failon. For the

reasons set forth below, the Court finds that summary judgment is

appropriate in this instance and therefore will grant the Summary Judgment

Motion.

## Procedural History in this Court

Debtor filed this chapter 7 case on June 12, 2011.  Lynn L. Tavenner

was appointed as trustee.  At the time the Debtor's chapter 7 case was filed,

Compass and the Debtor were engaged in a lawsuit in the United States

District Court for the Northern District of Georgia (the "Georgia District

Court"), Civil Action No. 1:09-cv-3491-RLV-WEJ (the "Georgia Litigation"),[1]

in which Compass sought an award of damages against the Debtor, True

---

[1] The RLV-WEJ suffix was subsequently changed to MHC upon the
retirement of the judge to whom the case was originally assigned.

North Products, LLC, ("True North") and Source 1 Specialty Chemicals, Inc. ("Source 1")[2] arising from the Debtor's prior employment by Compass. The Georgia Litigation was stayed by the filing of the Debtor's chapter 7 case in this Court.

On September 14, 2011, Compass filed a complaint (the "Complaint") initiating the instant adversary proceeding. In Count I of the Complaint, Compass objected to the discharge of the alleged unliquidated debt that was the subject of the Georgia Litigation, based upon 1) 11 U.S.C. § 523(a)(4), which prohibits the discharge of debts arising from fraud, conversion and larceny, and 2) 11 U.S.C. § 523(a)(6), which prohibits the discharge of debts that arise as a result of willful and malicious injury. In Count II of the Complaint, Compass requested that the Court find an order in the Georgia Litigation awarding damages for spoliation of evidence in favor of Compass and against the Debtor to be nondischargeable under 11 U.S.C. § 523(a), and in particular § 523(a)(6).[3]

In the Complaint, Compass also stated that it intended to file a motion to transfer venue to enable the Georgia Litigation and this dischargeability action to be heard simultaneously, either in this Court or in the Georgia District Court. Relative thereto, on March 8, 2012, Compass filed motions for

---

[2] True North Products, LLC, is a debtor in this Court, having filed a chapter 7 petition on June 12, 2011, Case No. 11-33876-KLP. The Debtor owns a 100% interest in True North Products, LLC. Source 1 Specialty Chemicals, Inc., is also a debtor in this Court, having filed a chapter 7 petition on June 12, 2011, Case No. 11-33875-KLP. True North Products, LLC, owns a 100% interest in Source 1 Specialty Chemicals, Inc.

[3] All further references to the Bankruptcy Code are to 11 U.S.C. §§ 101-1532.

relief from the automatic stay to enable it to proceed with the Georgia Litigation in the Georgia District Court. After a hearing held on April 4, 2012, this Court granted the motion for stay relief in the cases of the Debtor, True North, and Source 1.[4] The orders provided that the automatic stay of § 362 of the Bankruptcy Code remained in effect with respect to collection of any amounts awarded in the Georgia Litigation. The orders further provided that "[t]he issues of dischargeability raised by Compass in the Adversary Complaint shall remain under the jurisdiction of this Court and shall be held in abeyance pending completion of a trial and entry of a Final Order in the Georgia Action."

During the subsequent course of the Georgia Litigation, the parties regularly advised this Court as to its progress, either at a hearing or by filing a joint statement. At a status hearing held on May 20, 2015, which was attended by the Debtor pro se and by Compass through counsel, Compass advised this Court that the Georgia Litigation had been completed by the Georgia District Court's March 27, 2015, entry of a final judgment on spoliation damages and by Compass's voluntary dismissal of the remaining issues in the Georgia Litigation. At the status hearing, Compass, by counsel, advised the Court of its intent to file a motion for summary judgment in this adversary proceeding, seeking a determination of the dischargeability of the Georgia District Court's award of spoliation damages. The Court issued a

---

[4] Orders granting relief from the stay were entered in each case on April 19, 2012.

scheduling order relative thereto on May 28, 2015, and on June 26, 2015,

Compass filed the Summary Judgment Motion, seeking partial summary

judgment as to the dischargeability of the spoliation damages pled in Count

II of the Complaint.  A hearing on the Summary Judgment Motion was held

on October 1, 2015, at which the Court took the matter under advisement.

After the October hearing, each party submitted proposed findings of fact and

conclusions of law.

### The Georgia Litigation

**History of the litigation.**[5]  The Georgia Litigation was commenced

on November 11, 2009, when Compass filed a complaint (the "Georgia

Complaint") against the Debtor and True North in the Superior Court of

Cobb County, Georgia.  The Georgia Complaint centered on the termination

of the Debtor's employment with Compass and his formation of Source 1 and

True North.  In December 2009, the Georgia Complaint was removed to the

United States District Court for the Northern District of Georgia.  Source 1

was added as party defendant thereafter.

In October 2010, Compass filed a motion for spoliation sanctions (the

"Spoliation Motion"), and the presiding judge in the case (the "District Court

---

[5] Where appropriate, findings of fact shall be construed as conclusions of law
and conclusions of law shall be construed as findings of fact.  *See* Fed. R. Bankr. P.
7052.
       The history of the Georgia Litigation is set forth in the Complaint, the
Summary Judgment Motion and Compass's post-trial proposed findings of fact and
conclusions of law.  The Debtor has not contested this history.

Judge")[6] referred the motion to a magistrate judge ( the "Magistrate").  The

Magistrate addressed the Spoliation Motion in two separate reports and

recommendations, first considering whether sanctionable spoliation had

occurred and then addressing the issue of damages.

In determining whether spoliation of evidence had occurred, the

Magistrate held a three-day evidentiary hearing, at which both parties were

represented, before and after which the parties submitted briefs.  In

February 2011, the Magistrate issued an 86-page final report and

recommendation (the "Spoliation Report"), which made detailed findings of

fact and conclusions of law.  The Magistrate concluded that the Debtor had

engaged in spoliation of evidence and recommended that sanctions be

awarded against the Debtor and in favor of Compass.[7]  On March 21, 2011,

the District Court Judge approved the Spoliation Report over the objection of

the Debtor, Source 1 and True North, stating that "none of the defendants'

arguments have merits,"  and adopted the Spoliation Report as the opinion

and order of the Georgia District Court.[8]  The findings of the Spoliation

Report will be discussed below.

---

[6] The district court judge to whom the case was originally assigned retired
during the pendency of the case and the case was reassigned to another judge. The
use of the term "District Court Judge" in this opinion may refer to either of those
two judges.

[7] The Spoliation Report is attached to the Complaint as Exhibit B and to the
Summary Judgment Motion as Exhibit A.

[8] The order of the District Court Judge approving the Spoliation Report is
attached to the Complaint as Exhibit C and to the Summary Judgment Motion as
Exhibit B.

After approving the Spoliation Report, the District Court Judge referred the matter of damages to the Magistrate. After further briefing, the Magistrate filed a second report and recommendation (the "Damages Report"), recommending that the Debtor, True North and Source 1 pay damages to Compass in the amount of $123,835.95 (the "Spoliation Damages").[9] The District Court Judge approved the Damages Report on May 31, 2011, adopting the report as the opinion and order of the Georgia District Court and ordering that the Debtor pay $123,835.95 to Compass within ten days.[10] That order was stayed by the June 2011 bankruptcy filings of the Debtor, Source 1 and True North in this Court. The findings of the Damages Report will also be discussed below.

No trial was ever held on the substantive portions of the Georgia Complaint. Rather, Compass moved for entry of final judgment, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 54(b), on the Spoliation Damages. The Georgia District Court granted the motion as to the Debtor on March 27, 2015, and the clerk of that court entered judgment in the amount of $123,835.95 the same day.[11]

**The Spoliation and Damages Reports.** The Magistrate's lengthy Spoliation Report, adopted by the District Court Judge, sets forth in great

---

[9] The Damages Report is attached to the Complaint as Exhibit E and to the Summary Judgment Motion as Exhibit E.

[10] The order of the District Court Judge awarding Spoliation Damages is attached to the Complaint as Exhibit F and to the Summary Judgment Motion as Exhibit F.

[11] The 2015 Final Order of the District Court is attached to the Summary Judgment Motion as Exhibit G.

detail the facts surrounding the Spoliation Motion as well as the standard of law employed in ruling on that motion. Because both the facts and the law employed by the Magistrate and adopted by the District Court Judge are germane to this Court's decision as to dischargeability, they are summarized and set forth below.

*Findings of fact in the Spoliation Report*. Compass manufactures and sells specialty chemicals. The Debtor joined Compass in October 1999. Initially, he was an account manager and eventually rose to become, in 2001, Vice President and Technical Director. In 2006, he was named Vice President and Sales Manager, and in July 2007, he was named Vice President of Business Development and Technology, with a primary duty of developing new products as well as markets and applications for Compass's products. In that position, he became quite knowledgeable about Compass's products and pricing structure.

Because the Debtor did not work in the Atlanta headquarters of Compass but instead maintained a home office in Richmond, Virginia, Compass gave him a laptop computer (the "Laptop") and a desktop computer (the "Desktop") for his professional use. He used the Laptop extensively for email and to access Compass's databases. He used the Laptop when he traveled and also to access contact information for Compass's customers.

The Debtor's July 13, 2007, employment agreement with Compass, in effect when his employment with Compass ended, contained a confidentiality

clause.  The Debtor knew that he could not share confidential information he
obtained while employed by Compass, keep confidential information he
obtained while employed by Compass, or share with Compass's competitors
any confidential information he obtained while employed by Compass.
Among other things, Compass considered its customer lists, price structure,
profit margins, product formulations, future development plans, and
distribution structure to be confidential information.

Much of the information that Compass considered to be confidential
was contained on two computer databases.  The Debtor had access to each of
those databases.  The information on each database could be viewed, printed,
saved to the computer's hard drive, saved to an external drive, or
communicated via email.  The Debtor accessed the information on the
databases from time to time, but he testified at the evidentiary hearing
before the Magistrate that he could not recall downloading any materials to
the Laptop.  The Debtor did access certain of Compass's online sales reports
in April 2009 for six hours, for two hours in May 2009, and for over 12 hours
in June 2009.

On May 22, 2009, the Debtor received a letter from Compass notifying
him that his employment agreement would be terminated effective July 13,
2009.  The letter stated that the company wished to enter into a new
employment agreement with the Debtor, to be negotiated in the "coming
days."  This information had been shared informally with the Debtor two

weeks prior to the May 22, 2009, letter.  The Compass president testified that under the new agreement, the Debtor's base salary would be lower but that his compensation package would be restructured so that he could earn as much as or more than he had earned before.

On June 1, 2009, the Debtor took the Desktop to "Personal Computer Service Company" ("Personal Computer") and directed that its hard drive be reformatted.  The effect of this was to delete any data that had been stored on it.  The Debtor stated that his purpose was to delete any personal information from the machine, since his family had used it, and to make it possible to return the computer in working condition, because he had realized that there were problems with the machine.  After the Desktop's hard drive was reformatted, the Debtor used the Desktop and did not further reformat the hard drive, delete any files, or wipe the hard drive.

On June 24, 2009, Compass gave the Debtor a draft of a new employment agreement (the "Draft Agreement"), which reduced his base salary by 30 percent, while other employees received only a 10 percent reduction.  Prior thereto, the Compass president did not perceive that the Debtor was unhappy with his employment.  After receipt of the Draft Agreement, the Compass president believed that the Debtor planned to review the Draft Agreement with his attorney and then negotiate with Compass.

On June 27, 2009, the Debtor met in Houston with principals of Access Chemicals and Services ("Access Chemicals"), a competitor of Compass. Prior to that meeting, the Debtor met with his attorney. It is unclear exactly when that meeting took place, but in the Spoliation Report the Magistrate found that the meeting took place after the Debtor received the Draft Agreement. The Debtor's motivation in holding this meeting remains unclear, as the Debtor gave conflicting explanations as to why he had sought legal advice. In the Spoliation Report, the Magistrate cited deposition testimony of the Debtor that he had sought the advice of his attorney because he was concerned that he might be sued by Compass.

The meeting with Access Chemicals focused on the Debtor's working with Access Chemicals in some way in the future, whether as an employee, as a participant in a joint venture, or as a purchaser of Access Chemicals' products. At the conclusion of the meeting, the Debtor and the Access Chemicals principals agreed that the Debtor would submit a detailed proposal to Access Chemicals.

Two days later, on June 29, 2009, the Debtor took the Laptop to Personal Computer and requested that its hard drive be "wiped" so that others could not access its contents. The Debtor also stated that he needed documentation of the state of the Laptop when he returned it to Compass, and he requested that Personal Computer also prepare a written statement detailing the Laptop's problems. He also requested that the wipe of the hard

10

drive not be included in that statement.  Personal Computer subjected the

hard drive to a military wipe, which preventing anything on that drive from

ever being accessed.[12]  The Debtor testified in the Georgia Litigation that he

did not remove any Compass information from the Laptop because he had

transferred all Compass information that might have been on the Laptop to

the Desktop after its June 1, 2009, reformatting.

On July 10, 2009, the Debtor informed Compass that he was rejecting

the Draft Agreement and leaving his position at Compass.  The Debtor and

the Compass president met on July 14, 2009, at which time the Debtor

returned both the Laptop and the Desktop.  The Debtor advised the Compass

president that the Laptop had been inoperable for several weeks and

presented the statement from Personal Computer but did not disclose the

wipe of the hard drive.  At the meeting, the Compass president made it clear

to the Debtor that if he engaged in behavior prohibited by his 2007

employment agreement, Compass would pursue action against the Debtor.

On July 15, 2009, the day after the meeting, the Debtor registered

True North as a limited liability company in Virginia.  Thereafter, the Debtor

incorporated Source 1 as a Texas corporation that was wholly owned by True

North.  The Debtor began to solicit Compass clients, maintaining that the

non-solicitation provisions of his 2007 employment agreement had ended

---

[12] At the Georgia Litigation evidentiary hearing, the Debtor testified that he
wanted to delete any personal information from the Laptop before returning it to
Compass.  He further stated that he wanted to return the Laptop in the best
possible condition.

when the contract was terminated.  At the evidentiary hearings in the

Georgia Litigation, however, he did concede that the confidentiality and non-

disparagement clauses of the 2007 employment agreement remained in

effect.

After the Georgia Litigation was commenced and discovery began in

that case, questions arose regarding the Desktop and Laptop and the

information thereon.  In particular, information emerged proving that the

Debtor had been less than candid during the litigation process as to his use of

at least one computer thumb drive prior to his turnover of the Laptop and the

Desktop to Compass.

On April 26, 2010, the Debtor answered a Compass interrogatory in

which Compass asked the Debtor whether he had used any removable media,

including "CD-ROMS Zip disks, floppy disks, tape drives, thumb drives, and

removable hard drives" in any computer system he had used after July 13,

2007.  The Debtor unequivocally stated that he had used no such device.

Later, in a July 2010 deposition, the Debtor stated that he had not retained

any information from the Laptop by using a thumb drive and that he had not

owned a thumb drive in 2009.  He further stated that Personal Computer's

representative had not copied anything from the Laptop to a thumb drive.

Thereafter, after an examination of the Laptop and Desktops,

Compass's forensic expert concluded that in fact a thumb drive had been used

to copy data from the Desktop.  At that point, in November 2011, the Debtor

amended his interrogatory response to disclose the thumb drive and produced it for inspection.  The Debtor stated at the evidentiary hearing held in the Georgia Litigation that he had been fatigued and confused at the July 2010 deposition and thought that the question had related solely to any thumb drive provided to him by Compass.  He further revealed that he had used the thumb drive to transfer data to or from the Laptop and Desktop.  The expert examination of this thumb drive showed that most of its contents had been deleted.  The expert was able to recover some of the deleted files, and the Compass president testified that ninety percent of the recovered deleted content had been confidential Compass documents.

At the evidentiary hearing, the Debtor initially denied the existence of a second thumb drive but later admitted its possible existence.  He was unable to produce such a drive and testified that he had either thrown it away or lost it.  He further testified that he had not used a thumb drive to steal Compass's confidential information.  There was an unresolved dispute as to when a second thumb drive might have been used and whether it was used before or after the Debtor turned over the Laptop and Desktop to Compass.

After reviewing the evidence relative to the thumb drives, the Magistrate noted that:

> Mr. Failon denied ownership or knowledge of any thumb drive in multiple interrogatory responses and in his deposition, admitting to the existence of the known thumb drive only after plaintiff's expert discovered its use. . . . Mr. Failon's claimed

13

confusion simply is not credible. Moreover, although the second
thumb drive is not the smoking gun that plaintiff hoped it would
be, it was inexcusable for Mr. Failon to deny its existence until
the second day of the evidentiary hearing. Furthermore . . . Mr.
Failon's testimony during the evidentiary hearing was replete
with inconsistencies that further undermine his credibility.

Spoliation Report, p. 75.

*Conclusions of law in the Spoliation Report.* In determining whether

the Debtor was liable for spoliation, the Georgia District Court found that

spoliation could have occurred only if the Debtor had an obligation to

preserve the evidence in June 2009 when the hard drive of the Desktop was

reformatted and the hard drive of the Laptop was wiped. It further found

that federal law was applicable to the issue of whether the Debtor engaged in

spoliation of evidence. It used the federal standard set forth in *Fujitsu Ltd. v.*

*Federal Express Corp.*, 247 F.3d 423 (2d Cir. 2001), that "[t]he obligation to

preserve evidence arises when the party has notice that the evidence is

relevant to litigation or when a party should have known that the evidence

may be relevant to future litigation." *Id.* at 436.

The Georgia District Court found the Debtor had a duty to preserve the

information on the Laptop but not the information on the Desktop. The well-

considered factual analysis of the Georgia District Court in determining that

the Debtor had a duty to preserve the evidence on the Laptop is set forth

below:

[S]everal facts convince the Court that Mr. Failon had a duty to
preserve evidence by the time he wiped the laptop's hard drive
on June 29, 2009. Mr. Failon knew as of May 22, 2009, that

14

Compass intended to allow the 2007 employment agreement to terminate on July 13, 2009, and that Compass desired to enter into a new employment agreement. When he received the draft employment agreement on June 24, 2009, Mr. Failon learned that Compass sought to reduce his base salary by thirty percent. Mr. Failon's reasonable beliefs concerning the potential for litigation must be informed by his history with Compass. Namely, when Mr. Bellah attempted in 2006 to get Mr. Failon to agree to changes in the 2005 employment agreement, Mr. Failon and his attorney "interpreted it as a serious threat" and filed a lawsuit for anticipatory breach of contract. . . . Moreover, Mr. Failon felt oppressed by negotiations leading to the 2007 employment agreement. . . . Thus, it would not have been idle speculation for Mr. Failon to foresee in 2009 the potential for litigation with Compass. *See KCH Servs., Inc. v. Vanaire, Inc.*, No. 05-777-C, 2009 WL 2216601, at *1 (W.D. Ky. July 22, 2009) (finding familiarity with competitor's "willingness and ability to file suit" relevant to foreseeability of litigation).

Further, seeking legal counsel is indicative of anticipating litigation. Mr. Failon met with his attorney after reformatting the desktop's hard drive, but before wiping the laptop's hard drive. Although he denied any concern over being sued when he went to see Mr. Lorenz on June 29, 2009, Mr. Failon testified at his deposition and at the hearing that he was concerned that he might be sued by Compass. . . . Mr. Failon insisted during the hearing that he was no longer worried about litigation with Compass after meeting with his attorney. However, at most, the attorney could have reassured Mr. Failon that he would prevail in any dispute (as opposed to telling Mr. Failon what Compass would or would not do).[68]

Moreover, Mr. Failon shared his concerns over potential litigation with Ron Treece, the Access Vice-President, whom he was prohibited from contacting during his Compass employment. Specifically, Mr. Treece testified that when he first received a copy of Mr. Failon's employment agreement with Compass (before the June 27, 2009 meeting), Mr. Failon mentioned the possibility of being sued because "knowing Bellah . . . there's a possibility of it." . . . On the likelihood of litigation, Mr. Treece recalled that Mr. Failon "didn't say he was worried. He just said that there is a possibility that he would be [sued] regardless." . . . Finally, despite testifying to the "paramount" importance that he placed on returning the computers to Compass "in as close to full functionality as possible" . . . , Mr. Failon returned the laptop in a non-working condition

(inasmuch as there was no software on it), not only neglecting to inform Mr. McCaul that he had wiped its hard drive but also affirmatively concealing that fact.[68]

A reasonable person in Mr. Failon's position should have known on June 29, 2009, that the laptop's hard drive could be relevant to future litigation. *See Silvestri*, 271 F.3d at 591. Further, the evidence strongly suggests that Mr. Failon actually knew that there was a reasonable possibility of litigation at that time.[70] Given his distrust of Mr. Bellah and Mr. McCaul and his concern that he might be sued "regardless," a reasonably prudent person in Mr. Failon's position would have removed his own personal data from the laptop's hard drive and nothing more. That Mr. Failon affirmatively hid that he wiped the laptop's hard drive and gave false testimony about the thumb drive (and numerous other matters) only leads the Court to reject any claim by Mr. Failon that he did not reasonably foresee litigation with Compass.

---

[68]This is particularly true in light of the pre-existing animosity and Mr. Failon's stated belief that "[t]here's no limit to what Mr. Bellah will do" to prevent him from competing with Compass.

[69]If returning the laptop in full functionality was of paramount importance, Mr. Failon could have had Mr. Lorenz perform the recommended repairs, notwithstanding the latter's opinion that doing so would not have been cost effective, or reinstall the original software after wiping the hard drive. But, like in so many instances at the hearing, Mr. Failon contradicted himself about the software. With respect to the desktop, he testified that because he "had the original disks of the operating system and all the Office suite software," he instructed Mr. Lorenz to "load everything back onto the desktop in the hopes that it would be returned to like-new condition." . . . However, with regard to the laptop, Mr. Failon asserted he would have had Mr. Lorenz reload the Windows operating system and related software, but he "couldn't find it or maybe never had it because it might have been installed by Dell at the factory." . . . A consistent lack of veracity destroyed Mr. Failon's credibility.

[70]If in fact Mr. Failon did not misappropriate confidential information, then he had no reason to think the hard drive would be relevant to such claims. However, he admittedly was concerned about the non-solicitation clause and should have known that the laptop's hard drive would provide evidence to

prove or disprove any violation of the 2007 employment
agreement.

Spoliation Report, pp. 67-71.

Having determined that the Debtor had a duty to preserve the
contents of the Laptop, which duty he breached by wiping the contents of that
device, the Georgia District Court addressed whether sanctions should be
imposed for spoliation.  It employed a five-part test: 1) whether the
destruction of the evidence was prejudicial, 2) whether any such prejudice
could be cured, 3) how practically important the evidence was, 4) whether the
actions were done in good or bad faith, and 5) the potential for abuse.[13]  The
Georgia District Court determined that all five factors were satisfied and that
the imposition of sanctions was appropriate. In finding that the Debtor acted
in bad faith in destroying evidence, the Georgia District Court remarked that
the Debtor's actions were "at least negligent and may have been deliberate."[14]
The Georgia District Court pointed out that the wipe of the Laptop's hard
drive followed on the heels of the Debtor's meeting with Compass's
competitor, but noted that even if the timing had been coincidental, the
Debtor's subsequent lack of candor in disclosing the facts and circumstances
surrounding the wipe of the Laptop indicated bad faith.

---

[13] The five-factor test the Magistrate employed is found in *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009).

[14] It appears that the Georgia District Court made its finding that the Debtor acted at least negligently and possibly deliberately because one remedy for spoliation, the granting of default judgment, was available in the Eleventh Circuit only if the spoliation were not the result of "mere negligence in losing or destroying records."  Spoliation Report p. 74, n.71.

*The Damages Report.*  The Georgia District Court, in awarding

Spoliation Damages against the Debtor in the total amount of $123,835.95,

focused on the calculation of the damages amount and did not further

address the Debtor's actions or culpability other than to note several times

the bad faith of the Debtor.  The District Court Judge, in approving the

damages recommendation of the Magistrate, said that the purpose of the

award was to "shift the costs of the timely and expensive motion practice

related to the filing of the motion for spoliation damages from the plaintiff to

Mr. Failon."[15] On March 27, 2015, the award was reduced to final judgment

upon the motion of Compass.

## Conclusions of Law

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C.

§§ 157(a) and 1334(a) and the general order of reference entered by the U.S.

District Court for the Eastern District of Virginia on August 15, 1984.  This

matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Summary judgment is governed by Rule 7056 of the Federal Rules of

Bankruptcy Procedure, Fed. R. Bankr. P. 7056, which makes Rule 56 of the

Federal Rules of Civil Procedure, Fed. R. Civ. P. 56, applicable in adversary

proceedings, with one difference not applicable in this case.  Rule 56(a)

provides in part that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  In evaluating a

---

[15] Order of May 31, 2011, p. 3.

motion for summary judgment, a court must view the evidence and factual

inferences arising therefrom in the light most favorable to the party opposing

the motion. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). Compass

asserts that based upon the findings of the Georgia District Court, there is no

genuine dispute as to the facts and that the Spoliation Damages are

nondischargeable under § 523(a)(6) of the Bankruptcy Code as a matter of

law.

Under Bankruptcy Rule 4005, Fed. R. Bankr. P. 4005, Compass bears

the burden of proving nondischargeability by a preponderance of the

evidence. *Reed v. Owens (In re Owens)*, 449 B.R. 239, 253 (Bankr. E.D. Va.

2011); *Grogan v. Garner*, 498 U.S. 279, 291 (1991). In the Eastern District of

Virginia, preponderance of the evidence has been defined as "evidence which,

when weighed with that opposed to it, has more convincing force and is more

properly true and accurate. [When] the evidence appears to be equally

balanced, or if it cannot be said upon which side it weighs heavier, then

plaintiff has not met his or her burden of proof." *Brickhouse v. Orts (In re*

*Orts)*, Adv. No. 08-07075-SCS, 2009 WL 903259, at *11 (Bankr. E.D. Va. Feb.

24, 2009) (quoting *Smith v. United States*, 726 F.2d 428, 430 (8th Cir. 1984)).

Section 523(a)(6) excepts from a debtor's chapter 7 discharge any debt

"for willful and malicious injury by the debtor to another entity or to the

property of another entity." To establish nondischargeability under

§ 523(a)(6), "a creditor must ultimately prove three elements: '(1) the debtor caused an injury; (2) the debtor's actions were willful; and (3) that the debtor's actions were malicious.'" *Ocean Equity Group, Inc. v. Wooten (In re Wooten)*, 423 B.R. 108, 128 (Bankr. E.D. Va. 2010) *(*quoting *E.L. Hamm & Assocs., Inc. v. Sparrow (In re Sparrow)*, 306 B.R. 812, 834 (Bankr. E.D. Va. 2003)).  Exceptions to discharge "under 11 U.S.C. § 523 are to be construed narrowly."  *La Bella Dona Skin Care, Inc. v Harton (In re Harton)*, Adv. No. 13-03028-KRH, 2013 WL 5461832, at *3 (Bankr. E.D. Va. Oct. 1, 2013) (citing *Nunnery v. Nunnery (In re Rountree)*, 478 F.3d 215 (4th Cir. 2007)); *Carmelo v. Mickletz (In re Mickletz)*, 544 B.R. 804, 812 (Bankr. E.D. Pa. 2016) (citing *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir. 1995)).

Judge St. John has set forth in detail the requirements of § 523(a)(6). In *Ocean Equity Group, Inc. v. Wooten (In re Wooten)*, 423 B.R. 108 (Bankr. E.D. Va. 2010), he discussed the two required elements that are the most problematic, willfulness and malice.  As to willfulness, he confirmed that the test in the Eastern District of Virginia is whether the debtor acted with "substantial certainty [that] harm [would result] or a subjective motive to cause harm."  423 B.R. at 129 (quoting *Parsons v. Parks (In re Parks)*, 91 F. App'x 817, 819 (4th Cir. 2003)).  Judge St. John summarized the history of the element in light of the decision of the Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998):

> The United States Supreme Court dramatically changed the landscape of § 523(a)(6) nondischargeability proceedings in its

decision of *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).[16] In *Geiger,* the Supreme Court concluded the language of § 523(a)(6) encompassed only acts done with the actual intent to cause injury and not merely intentional acts that happen to cause injury:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.,* "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."

*Id.* at 61–62, 118 S.Ct. 974 (citing Restatement (Second) of Torts § 8A cmt. a (1964)). Immediately after *Geiger,* courts considered different approaches as to the proper application of Geiger to adjudication of these disputes. *In re Sparrow,* 306 B.R. at 838 ("Thus, we are confronted by a difference of interpretation between the various circuits in the aftermath of *Geiger,* with the critical distinction as to whether finding that a debtor was substantially certain that harm would occur is measured by a wholly subjective standard or an objective determination."). Judge Huennekens has more recently considered this question and has written:

> Since the *Geiger* decision, courts have struggled to determine whether a debtor must have specifically intended the injury or whether the commission of an intentional tort that is "substantially certain to result in injury" is sufficient to satisfy the willfulness requirement. *Johnson v. Davis (In re Davis),* 262 B.R. 663, 670 (Bankr. E.D. Va. 2001). This Court has previously adopted the "objective substantial certainty" or "subjective motive" test to satisfy the willfulness requirement. *In re Trammell,* 388 B.R. 182, 187 (Bankr. E.D. Va. 2008) (citing *Parsons v. Parks (In re Parks),* 91 Fed.Appx. 817,

818–19 (4th Cir.2003) ("[t]he test, then, is whether the debtor acted with 'substantial certainty [that] harm [would result] or a subjective motive to cause harm.' ")). *Singh v. Sohail (In re Sohail),* Adv. No. 08–03059–KRH, 2009 WL 1851247, at \*7 (Bankr. E. D. Va. June 25, 2009).

*In re Wooten*, 423 B.R. at 129-29.  *See also Yousuf v. Samantar (In re Samantar)*, 537 B.R. 250, 256 (Bankr. E.D. Va. 2015); *Haas v. Trammell (In re Trammell)*, 388 B.R. 182, 186-87 (Bankr. E.D. Va. 2008).[16]

The element of malice  may be addressed more succinctly.  Malice in the bankruptcy context may differ from malice in contexts outside of bankruptcy.  *Johnson v. Davis (In re Davis)*, 262 B.R. 663, 670 (Bankr. E.D. Va. 2001).  An act is malicious in the context of § 523(a)(6) if it is done "deliberately, intentionally and with knowing disregard for [the] plaintiff's rights."  *In re Owens*, 449 B.R. at 255 (quoting *In re Davis*, 262 B.R. at 670).

---

[16] The Fourth Circuit is not alone in its adoption of the "substantially certain to cause harm" interpretation of *Geiger*.  *See J & V Developers, Inc. v. Malloy (In re Malloy)*, 535 B.R. 81, 93 (Bankr. E.D. Pa. 2015) ("Case law in the Third Circuit instructs that deliberate 'actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury are willful within the meaning of § 523(a)(6).' *Coley,* 33 B.R. at 497 (citing *In re Conte*, 33 F.3d 303, 307–09 (3d Cir.1994))."); *Beard Research, Inc. v. Kates (In re Kates)*, 485 B.R. 86, 105 (Bankr. E.D. Pa. 2012) (finding that issue preclusion barred relitigation of state court finding of spoliation of evidence and inferring intent sufficient to satisfy the requirements of § 523(a)(6) from actions the court deemed substantially certain to harm the plaintiffs); *Netria Corp. v. Graham (In re Graham)*, 363 B.R. 32, 38 (Bankr. D.N.H. 2007) ("an injury is willful, for purposes of section 523(a)(6), if it is inflicted 'either with intent to cause the harm complained of, or in circumstances in which the harm was certain or almost certain to result from debtor's act.") (quoting *Jones v. Svreck* (*In re Jones*), 300 B.R. 133, 140 (B.A.P. 1st Cir. 2003)); *Synergeering Gp., LLC, v. Jonatzke (In re Jonatzke)*, 478 B.R. 846, 855 (Bankr. E.D. Mich. 2012) ("The U.S. Court of Appeals for the Sixth Circuit has held that 'willfulness' also means that 'the actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it....'") (quoting *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir.1999)) (holding that state court judgment for spoliation of evidence was entitled to conclusive effect in § 523(a)(6) action, based on principle of collateral estoppel).

Further, malice may be demonstrated from the implications of the debtor's

behavior, "as well as a presentation of the surrounding circumstances." *In re*

*Davis*, 262 B.R. at 671. *See also In re Wooten*, 423 B.R. at 130. As such, a

creditor need not prove actual ill will on the part of the debtor or any specific

intent to injure the creditor. *In re Wooten*, 423 B.R. at 130.

Compass maintains that the elements of § 523(a)(6) have already been

proven in the Georgia Litigation and that the doctrine of collateral estoppel

requires a finding that the Spoliation Damages are nondischargeable. The

doctrine of collateral estoppel, or "issue preclusion," prohibits the relitigation

of an issue of fact or law in a different cause of action by a party when that

party had "a full and fair opportunity to litigate the issue in the previous

case." *Johnson v. Stemple* (*In re Stemple*), 361 B.R. 778, 795 (Bankr. E.D. Va.

2007). The doctrine is based upon the principle that "a losing litigant

deserves no rematch after a defeat fairly suffered, in adversarial proceedings,

on an issue identical in substance to the one he subsequently seeks to raise."

*In re Mickletz*, 544 B.R. at 813 (quoting *Dici v. Pennsylvania*, 91 F.3d 542,

547 (3d Cir. 1996)).

A party seeking to assert collateral estoppel must establish:

that (1) the issue or fact is identical to the one previously
litigated; (2) the issue or fact was actually resolved in the prior
proceeding; (3) the issue or fact was critical and necessary to the
judgment in the prior proceeding; (4) the judgment in the prior
proceeding is final and valid; and (5) the party to be foreclosed
by the prior resolution of the issue or fact had a full and fair
opportunity to litigate the issue or fact in the prior proceeding

23

*In re Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2004).

*See also Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006).

The Debtor admits in his post-hearing brief that "Plaintiff has succeeded in establishing the five (5) elements necessary for Collateral Estoppel."  However, he then states that "Plaintiff does <u>not</u> establish the three (3) elements called for under § 523(a)(6) to render a debt non-dischargeable."  In light of those two conflicting statements, the Court will analyze whether collateral estoppel applies in this case.  Examining each of the elements of collateral estoppel set forth above, the Court finds that the two last elements are satisfied beyond doubt.  The Debtor had a full and fair opportunity to defend himself in the Georgia Litigation, and the judgment in that court is final and valid, the final judgment having been entered by the Georgia District Court on March 27, 2015.[17]

Elements one through three of collateral estoppel are inextricably related, and a determination as to them requires the Court to examine whether the Georgia District Court made findings as to each of the elements necessary for a finding of willful and malicious injury in the bankruptcy context.  It is not disputed that the Georgia District Court found that the acts of the Debtor injured Compass, as it awarded damages against the Debtor for spoliation of evidence.  Thus, the only two elements of § 523(a)(6) in dispute are willfulness and malice.

---

[17] The Court has not been advised of any timely appeal of this final order, and the Court takes judicial notice of the official docket in the Georgia Litigation, which reveals no such appeal.

As to malice, the Georgia District Court, citing *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d at 436, found that under federal law, the Debtor had a duty to preserve the information on the Laptop and that the Debtor breached that duty. (Spoliation Report at 67). The Georgia District Court found that in light of his situation, the Debtor had a duty to preserve the information contained on the Laptop because he "should have known . . . that the laptop's hard drive could be relevant to future litigation." (Spoliation Report at 70). It found that despite this duty, the Debtor caused the hard drive of the Laptop to be wiped. The Georgia District Court's finding that the Debtor breached his duty to preserve evidence satisfies the malice element of § 523(a)(6) that an act be done "deliberately, intentionally and with knowing disregard for plaintiff's rights."

Further, malice may be inferred from the circumstances, set forth above in the Georgia District Court's Spoliation Report, surrounding the Debtor's actions in removing information from the Laptop. These circumstances include the Debtor's actions in instructing that the invoice for wiping the Laptop not disclose such action, the Debtor's meeting with his attorney, the Debtor's solicitation of Compass's competition, the Debtor's stated concern that there might be future litigation, and the Debtor's distrust of the Compass executives. The Debtor's actions indicate that the Debtor knew he was acting in disregard of Compass's rights, and as such his actions may be construed as malicious under § 523(a)(6).

25

The findings of the Georgia District Court also establish that the Debtor acted willfully in the context of § 523(a)(6).  The Georgia District Court found that the Debtor had a duty to preserve the evidence because he either foresaw the potential litigation with Compass or should have foreseen that possibility.  In a footnote, the Georgia District Court noted also that the Debtor "admittedly was concerned about the non-solicitation clause and should have known that the laptop's hard drive would provide evidence to prove or disprove any violation of the 2007 employment agreement." (Spoliation Report at 70, n.70).  Applying the willfulness test set forth by Judge Huennekens in *In re Sohail*, whether a debtor acted with substantial certainty that harm would occur, to the Georgia District Court's determination that the Debtor had a duty to preserve evidence because he should have known that the evidence he destroyed would be relevant to future litigation, the Court finds that the Georgia District Court's findings are sufficient to satisfy the § 523(a)(6) willfulness test.

The Debtor argues that his actions in wiping the Laptop were a "willful, but negligent, act" that do not satisfy the requirements of  § 523(a)(6) as set forth in *Geiger*.  The Court disagrees with this assessment.  The proper standard by which the Debtor's actions are to be evaluated is the Fourth Circuit's interpretation of *Geiger* in *In re Parks*, which allows a creditor to

prove willfulness by showing that an was act taken "with a substantial certainty that harm would result. . . ." *In re Parks*, 91 F. App'x at 819.[18]

The Court notes that Compass places great emphasis on that fact that the Georgia District Court found the Debtor acted in bad faith in wiping the information from the Laptop. That finding, while important in the Georgia Litigation as a prerequisite to an award of damages for spoliation, is not necessary for a determination of willful and malicious injury under § 523(a)(6), although it is not unusual for bad faith and willful and malicious injury to coexist.

The Court finds that the issues and facts determined in the Georgia litigation were the same as those before this Court in Compass's § 523(a)(6) objection, that the Georgia District Court determined those facts and issues, and that the facts and issues were critical to the Georgia Litigation. Having now found that all five elements of the *Microsoft Antitrust Litigation* collateral estoppel test are satisfied, the Court finds that the doctrine of collateral estoppel precludes further litigation under § 523(a)(6) as to the dischargeability of the Spoliation Damages and finds that Compass is entitled to summary judgment as a matter of law. Therefore, the Court will grant the motion of Compass for summary judgment as to the nondischargeability of the Spoliation Damages under § 523(a)(6). A separate order shall issue.

---

[18] The Debtor raises a host of other errors that he urges were made in the Georgia Litigation. However, this Court does not sit as an appellate court for the Georgia District Court and as such will not address such arguments.

Entered:      March 29, 2016                    _____/s/ Keith L. Phillips_____
                                               United States Bankruptcy Judge

                                               ENTERED ON DOCKET: Mar 29 2016

Copies:

James K. Donaldson
Jennifer J. West
Spotts Fain PC
411 East Franklin Street
Suite 600
Richmond, VA 23219

Brian K. Failon
3804 Maida Court
Richmond, VA 23233

Lynn L. Tavenner
20 North Eighth Street, Second Floor
Richmond, VA 23219

Shannon Pecoraro
Office of the U.S. Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219